**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | | |
|---|---|---|
| IN RE: | * | |
| | * | |
| KEY AUTO LIQUIDATION CENTER, INC., | * | CASE NO.: 07-30419-LMK |
| | * | |
| | * | |
| Debtor. | * | CHAPTER: 7 |
| | * | |

**ORDER GRANTING PETITIONING CREDITORS'**
**MOTION FOR SUMMARY JUDGMENT**

THIS CASE was heard June 21, 2007, on the Motion for Summary Judgment filed by Petitioning Creditors Vannoy's Tires, Inc., Gulf States Auto Auction, LLC, Fact-O-Bake of Pensacola, Inc., and Automotive Alternative, LLC. The Creditors' Motion for Summary Judgment seeks a determination that they are entitled to an order for relief on their involuntary petition against the Alleged Debtor under Chapter 7 of the Bankruptcy Code. At the conclusion of the hearing, the Alleged Debtor and the creditors opposing the motion were given twenty (20) days to supplement their responses to the motion, failing which relief would be ordered. There having been no further evidence submitted to the Court which establishes a genuine issue of material fact as to the Petitioning Creditors' entitlement to relief, the Motion for Summary Judgment will be granted.

This Involuntary Petition under Chapter 7 was filed on May 4, 2007, by the four moving creditors plus two other creditors, Anthony J. Ciano and the Ciano Family Partnership, LLP. The Motion for Summary Judgment is supported by Affidavits from representatives of the four moving creditors plus Sharon Flowers, a former employee of the Alleged Debtor, and Alan

1

Siskind, a Shareholder, Director and President of the Alleged Debtor. The Affidavits from the four creditors establish that they are owed various sums which have either gone unpaid by the Alleged Debtor or have been paid with checks that were returned for insufficient funds. The Affidavit of Siskind states that since March of 2007, the Alleged Debtor has been substantially delinquent in paying its local vendors. The Affidavit of Sharon Flowers states that from June 2006 to April 2007, she was employed by the Alleged Debtor and her duties included receiving invoices from local vendors, verifying the validity and amount of the invoices, and processing payments. While she was able to prepare local vendor checks, she was not allowed to send them out without the approval of Danielle Barr, Controller of Auto Finance Center of America, Inc. (AFC), a lending company affiliated with Mark Horvath, another principal of the Alleged Debtor. The Flowers Affidavit reaffirms that the Alleged Debtor was, in March 2007, substantially delinquent in payments to local vendors in verified amounts due to the four moving creditors.

The Alleged Debtor together with creditors AFC, Detroit II Automobiles, Inc., NAF Corporation, Inc., and Ohio Funding Group, Inc.[1] (the "Lenders"), affiliates of Mark Horvath, filed oppositions to the Motion for Summary Judgment. The oppositions do not contest the allegation that the Alleged Debtor was not paying its debts as they became due, but instead, attempt to create disputes as to the amount owed to the moving creditors. They attempt to do so through the Affidavits of Mark Horvath, Gerald Kocak, and Danielle Barr. Horvath's Affidavit asserts that in April 2007, he was prevented from obtaining access to the onsite records and properties of the Alleged Debtor, pursuant to the directions of Siskind and Ciano. Attached to Horvath's Affidavit is what purports to be a listing of the Alleged Debtor's creditors as of June 20, 2007

---

[1] After the counsel for Ohio Funding Group, Inc. was allowed to withdraw post-petition (Doc. 46), Ohio Funding Group, Inc. joined the Petitioning Creditors in seeking an order for relief. *See Joinder in Involuntary Petition,* Doc. 78.

which does not reflect debts to the four moving creditors. However, the listing does reflect past due accounts to 26 different trade creditors. The accounts payable list is not verified, and on its face it shows that it is a record produced by AFC, and not by the Alleged Debtor. The Affidavit of Gerald Kocak states that he is employed by Horvath Holdings and that he is the Supervisor of Financial Operations for Horvath Holdings, AFC, NAF, and Ohio Funding Group. He further states that Danielle Barr as Controller of AFC accessed and printed out payment records for the Petitioning Creditors and based on his "understanding and belief," printouts of the cash disbursement journals of Alleged Debtor reflect the issuance of the checks to the moving creditors. However, there is no allegation of personal knowledge regarding whether or not those checks were sent or whether they were paid. Kocak also states that beginning in April 2007, he was prevented from accessing the books and records of the Alleged Debtor. Finally, Danielle Barr's Affidavit reflects the printouts that she prepared of the cash disbursement ledger of the Alleged Debtor, however she makes no allegation regarding delivery or payment of the checks reflected in the records.

While the Affidavits submitted by the moving creditors set forth specifically the amounts of the delinquency by the Alleged Debtor, the Affidavits from the Respondents do not contain any evidence that would be admissible to contradict the Affidavits of the Movants. However, based on the allegations that the principals of the Alleged Debtor were denied access to its records by persons acting at the direction of Siskind and Ciano, the Respondents were given an additional 20 days to conduct expedited discovery and to submit additional evidence to contradict the assertions by the moving creditors.

At the end the 20-day period the Alleged Debtor filed five depositions and a Supplement Brief with the Court. Four of the depositions (Docs. 57, 59, 60, and 61) were taken of the Peti-

tioning Creditors' representatives, and the fifth is a deposition of Ciano (Doc. 58). The depositions verify that debts to the trade creditors in certain undisputed amounts remain unpaid. The depositions also show that Ciano is funding the prosecution of the instant involuntary petition, and that Ciano advised Todd Gordon, Manager of the Beverly Parkway branch of the Alleged Debtor, not to mail certain checks for fear they would be returned for insufficient funds.

During the 20-day period Foss and Horvath offered to purchase the claims of the trade creditors, not with funds of the Alleged Debtor, but with their own funds. *See* Docs. 63, 70, and 73. The offer to pay these claims in full reassures the Court that they are not subject to bona fide dispute. *See In re Faberge Restaurant of Florida, Inc.*, 222 B.R. 385, 388 (Bankr. S.D. Fla. 1997) (stating that payment of a debt post petition is an admission of liability). Nonetheless, the Alleged Debtor urges that the entry of an order for relief is still inappropriate because the petition was filed in bad faith.

Though the 11th Circuit has declined to embrace a single test for determining when an involuntary petition is filed in bad faith, it has favorably referred to three: (1) the "improper purpose" test; (2) the "improper use" test; and (3) the "Rule 9011" test. *General Trading Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1501-02 (11th Cir. 1997). Regardless of which test used, bad faith does not exist when a petitioning creditor's primary motivation in filing the petition is to "protect itself against other creditors' obtaining a disproportionate share of [the alleged debtor's] assets." *Id.*

The evidence shows that the Petitioning Creditors and Ciano filed the instant petition primarily for the purpose of protecting themselves against the dissipation of the Alleged Debtor's assets when it appeared that the Lenders were going to obtain a disproportionate share. In late March of 2007 over $100,00 was transferred from the Alleged Debtor's bank accounts to the Foss-

affiliated Lenders while the Petitioning Creditors went unpaid. *Ciano Deposition*, Doc. 58, p. 61-73; *Flowers Affidavit*, Doc. 12, Ex. 6; *Suskind Affidavit*, Doc. 12, Ex. 5; *Summary of Checks*, Doc. 68, Ex. B; *See Garrett Deposition*, Doc. 57, p. 19-23; *Hackney Deposition*, Doc. 59, p. 13-17; *March 2007 Milton Account Bank Statement*, Doc. 63, Ex. E; *April 2007 Milton Account Bank Statement*, Doc. 68, Ex. E.  On April 4, 2007, some of the Lenders secured pre-existing debts by filing UCC financing statements with the Florida Secretary of State, which allowed them to repossess almost all of the Alleged Debtor's inventory shortly before the filing of the involuntary petition.  *See Supplement to Motion for Summary Judgment*, Doc. 21.  As in *General Trading*, the Petitioning Creditors had reason to believe that the Alleged Debtor was making preferential transfers, which can be avoided only under the Bankruptcy Code.  Since the Alleged Debtor was no longer operating and the only task that remained was liquidation, the Petitioning Creditors filed the involuntary petition to ensure that they got their fair share of the Alleged Debtor's assets. *Ciano Deposition*, Doc. 58, p. 66-70; *Garrett Deposition*, Doc. 57, p. 20-22.  The Petitioning Creditors' motivation is similar to that of the petitioning creditor in *General Trading*. *See General Trading*, 119 F.3d at 1501-05.

The Alleged Debtor's theory of bad faith is somewhat outlandish when the uncontroverted evidence is considered.  Essentially, the theory is that Ciano is a Svengali who used the Petitioning Creditors as pawns after manufacturing unpaid debts to serve as the pretense for the filing of the involuntary petition in a scheme orchestrated for the purpose of gaining an advantage in the fight against Foss and Horvath for control over the Alleged Debtor.  There is no admissible evidence to support these conclusory accusations; rather, the Alleged Debtor has inaccurately characterized the evidence on file to suggest that a finding of bad faith can be inferred.

For example, the Alleged Debtor points to the fact that Ciano is bankrolling the prosecution of the involuntary petition, which is true. But the evidence shows that Ciano felt compelled by a moral obligation to the trade creditors with whom he regularly transacts business. *Ciano Deposition*, Doc. 58, p. 70-74. The payment of attorneys' fees by one petitioning creditor for the benefit of others does not necessarily indicate bad faith.

It is also true that the trade creditors have rejected the offer of Foss and Horvath to purchase an assignment of their claims. But the reason they rejected the offer is because settlement talks broke down when a misunderstanding led to a disagreement as to the terms of the assignment, and because Foss and Horvath have refused to pay the fees and costs that have been incurred as a result of the filing the involuntary petition. *See Supplemental Brief (Second)*, Doc. 70; *Response*, Doc. 71; *Reply Brief*, Doc. 73. Nothing requires petitioning creditors to accept a settlement offer if they would rather seek the protections of the Bankruptcy Code. Besides, an alleged debtor cannot avoid an order for relief by paying creditors post petition. *See In re Faberge Restaurant of Florida, Inc.*, 222 B.R. 385, 388 (Bankr. S.D. Fla. 1997) (stating that it is "well-settled that the fact that a creditor is paid post petition and withdraws his joinder in an involuntary case does not render the petition insufficient for lack of sufficient number of eligible creditors" and "the post-petition payments will not deprive the court of jurisdiction or require dismissal of the petition" since the involuntary petition protects all creditors); *Matter of Sjostedt*, 57 B.R. 117, 120 (Bankr. M.D. Fla. 1986); *In re Crain*, 194 B.R. 663, 667-68 (Bankr. S.D. Ala. 1996).

The Alleged Debtor also argues that bad faith exists because Ciano had the ability to exercise control over the Alleged Debtor's bank accounts and transferred funds from the Milton account to the Pensacola account (on Beverly Parkway) on April 2 and 3, 2007. In addition, Ciano told Todd Gordon, the Manager of the Beverly Parkway branch of the Alleged Debtor, not to mail

6

certain checks to some of the Petitioning Creditors.[2]  However, according to the bank statements from the Milton account for March and April of 2007 and the Pensacola account for April of 2007 (respectively, Doc. 63, Ex. E; Doc. 68, Ex. E; and Doc. 63, Ex. C, the "Bank Statements"), there were significant overdrafts in both accounts.  The Pensacola account appears to have had checks returned for insufficient funds in April, as did the Milton account in March.  The reason Ciano recommended holding the checks is because there did not appear to be enough money in the Alleged Debtor's bank accounts to cover them.  *Ciano Deposition*, Doc. 58, pg. 67-70; *Flowers Affidavit*, Doc. 12, Ex. 6.  Nothing in the admissible evidence suggests, as the Alleged Debtor seems to urge, that Ciano was actively manipulating the bank accounts to manufacture a shortfall so there would be insufficient funds resulting in unpaid debts, which could then form the basis for the involuntary petition.  To the contrary, Ciano was transferring funds between accounts in an attempt to prevent checks from bouncing as a result of the shortfall that Foss and Horvath created by transferring funds to their own affiliates and failing to adequately fund the dealerships.  *See Ciano Deposition*, Doc. 58, pg. 67-74; *Bank Statements*; *Flowers Affidavit*, Doc. 12, Ex. 6; *Suskind Affidavit*, Doc. 12, Ex. 5.

This case is not like *Matter of Winn*, 49 B.R. 237 (Bankr. Fla. 1985), where the individual alleged debtor enlisted friendly creditors to file the involuntary petition so that he could continue to avoid paying a judgment that a non-petitioning creditor had been frustrated from collecting for some time due to the alleged debtor's previous voluntary bankruptcy filings, which had also been dismissed for bad faith.  The petitioning creditors in *Winn* were friendly to the alleged debtor, while the Petitioning Creditors here are hostile to the Alleged Debtor.

---

[2]  Those checks were supposed to have been sent to Cintas, Bellsouth, Advanced Business Computers, Worldwide Express, Emerald Coast Utilities Authority, Vannoy's, Fact-O-Bake, and Pensacola Battery.  Doc. 63, Ex. D.  Of these, only Vannoy's and Fact-O-Bake are initial Petitioning Creditors.

More importantly, nine additional creditors[3] have joined the petition since it was filed; to date, there are a total of 15 Creditors who claim debts in the aggregate amount of $615,071.38. If the claims of Ciano and the Ciano Family Trust were excluded, there would still be 13 Creditors holding claims in the aggregate amount of $285,071.38. The Alleged Debtor argues that it would be unfair to allow the joinder of additional creditors because they were filed just before or after the July 11, 2007 deadline set by the Court. However, § 303(c) explicitly allows creditors holding non-contingent, unsecured claims to join the petition before dismissal or the entry of an order for relief. 11 U.S.C. § 303(c). The Alleged Debtor's claim of surprise at the joinder of the additional Creditors is belied by the fact that six of the nine Creditors filing joinders were identified by the Alleged Debtor itself in the Affidavit of Mark Horvath, filed June 20, 2007 (Doc. 36). That Ciano allegedly sought out additional creditors to join the petition is beside the point since "[t]he mere fact that one petitioning creditor seeks out others to join in the filing of an involuntary petition does not give rise to a finding of bad faith on the part of the petitioning creditor," unless the solicitation consisted of false statements, itself amounted to fraud, or the intervening creditors felt undue pressure to join the petition. *In re Reveley*, 148 B.R. 398, 410 (Bankr. S.D.N.Y. 1992); *U.S. Fid. & Guar. Co. v. DJF Realty & Suppliers, Inc.*, 58 B.R. 1008, 1012 (N.D.N.Y. 1986) (stating, "it would be idealistic for this court to believe that three creditors would voluntarily travel to the bankruptcy court and meet on its doorstep with an identical purpose, to commence an involuntary bankruptcy proceeding against an alleged debtor"). There has been no suggestion that Ciano's solicitations contained false statements or put undue pressure on the other Creditors. Even assuming that Ciano is tainted by bad faith, the other Creditors with

---

[3] The additional Creditors are (1) P.A.T. Auto Transport, Inc., (2) Lee Auto Transport, (3) Want Ads of Pensacola, Inc., (4) Ace Unlocks of Pensacola, Inc., (5) Kell Recovery, (6) McKenzie Motor Company, (7) William's Transmissions, Inc., (8) Mediacom, and (9) Ohio Funding Group, Inc.

valid claims would not be barred from properly joining the petition. *Fetner v. Haggerty*, 99 F.3d 1180, 1181 (D.C. Cir. 1996).

The Alleged Debtor has had ample opportunity to submit admissible evidence to show that an order for relief would be inappropriate under § 303, but no such evidence has been submitted. Further, abstention is not in the best interest of the Creditors, especially since litigating who controls the Alleged Debtor would probably be more expensive than an orderly Chapter 7 liquidation.

The Movants having demonstrated that there are no genuine issues of material fact, that the debtor is generally not paying its debts as they become due and that such debts are not the subject of a bona fide dispute as to liability or amount, and that there are a sufficient number of petitioning creditors with claims in the aggregate of at least $13,475.00, relief should be ordered pursuant to 11 U.S.C. § 303. Accordingly, it is

ORDERED AND ADJUDGED that the Petitioning Creditors' Motion for Summary Judgment is GRANTED and relief under the provisions of Chapter 7 is ordered against Key Automotive Liquidation Center, Inc.

DONE AND ORDERED at Tallahassee, Florida, this 31st day of July, 2007.

/s/ Lewis M. Killian
LEWIS M. KILLIAN, JR.
United States Bankruptcy Judge

cc: all interested parties

9